IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-CV-537-LTB-MJW

MARK LEAL, TANYA LEAL and MARK PAUQUETTE, on behalf of themselves and all others similarly situated,

            Plaintiffs,

vs.

SONIC - MASSEY PONTIAC BUICK GMC, INC. and SONIC AUTOMOTIVE, INC. aka CORNERSTONE ACCEPTANCE CORPORATION,

            Defendants.
_____

**FIRST AMENDED CLASS ACTION COMPLAINT WITH JURY DEMAND**
_____

**INTRODUCTORY STATEMENT**

This class action is brought by Named Plaintiffs Mark and Tanya Leal (jointly, the "Leals"), and Mark Pauquette ("Pauquette"), as representatives of a putative class of automobile consumers, to address pervasive, deceptive practices to which such customers are frequently subjected in this state. This action is brought pursuant to the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), the Colorado Uniform Consumer Credit Code, C.R.S. §§ 5-1-101 *et seq.* ("UCCC"), and the Colorado Consumer Protection Act, C.R.S. §§ 6-1-101 *et seq.* (the "CCPA"), and also includes pendent common law claims.

The unlawful practices to which hundreds of Colorado consumers have been subjected include, without limitation, charging customers for non-existent add-on equipment and accessories, misrepresenting consumers' financial condition to lenders in order to facilitate the purchase of higher-end vehicles to provide Defendants with

more lucrative profits, requiring consumers to purchase credit insurance which should be optional, and failing to provide accurate disclosures of the costs of credit. Plaintiffs file this action for actual damages, statutory damages, injunctive and declaratory relief, disgorgement of unlawfully obtained profits, attorneys' fees and costs.

## JURISDICTION AND VENUE

1. This Court's federal question jurisdiction over Plaintiffs' TILA claim is invoked pursuant to 28 U.S.C. §§ 1331, 1337, and 1343. This action is authorized and instituted pursuant to 15 U.S.C. § 1640.

2. The Court's supplemental jurisdiction over Plaintiffs' state law claims is invoked pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Defendants' conduct alleged to be unlawful was committed within the jurisdiction of the U.S. District Court for the District of Colorado. Defendants maintain offices and conduct business within the District of Colorado.

## PARTIES

4. Plaintiff Mark Leal is a natural person, is married to Tonya Leal, and is a resident of Colorado.

5. Plaintiff Tanya Leal is a natural person, is married to Mark Leal, and is a resident of Colorado.

6. Plaintiff Mark Pauquette is a natural person and a resident of Colorado.

7. Defendant Sonic - Massey Pontiac Buick GMC, Inc. ("Massey Pontiac") is a Colorado corporation with its principal place of business located at 8120 West Tufts Avenue, Denver, Colorado.

8. Defendant Sonic Automotive, Inc., aka Cornerstone Acceptance Corporation ("Sonic"), is a Delaware corporation with its principal place of business in Charlotte, NC. It is the parent company of Massey Pontiac and is authorized to do business in Colorado.

**ALLEGATIONS REGARDING THE CLASS REPRESENTATIVES**

Upon information and belief, Plaintiffs allege the following:

9. On or about March 26, 2005 and March 28, 2005, the Leals purchased two motor vehicles from Defendants for personal, family, or household purposes. The Leals purchased a 2002 GMC Yukon and a 2004 Kia Optima.

10. The Leals financed the purchases by means of two motor vehicle retail installment sales contracts ("RISC"). The RISCs were prepared on a preprinted form, supplied by Defendants.

*The Leal Yukon Transaction*

11. Defendants informed the Leals that they were required to purchase GAP insurance to qualify for financing of the Yukon. GAP is an insurance product that purports to pay the difference between a consumer's obligation under a credit transaction and the retail value of the vehicle in the event of a total loss. It is a charge imposed in credit transactions. The Leals purchased GAP because of Defendants' misrepresentations and concealment. The Defendants told the Leals that GAP Insurance was required to obtain financing for their purchase. The fact that GAP is optional and not required in a credit transaction - was not disclosed to them.

12. Defendants did not provide a written GAP policy to the Leals. Defendants did not inform the Leals that, under the policy exclusions, the purported coverage was

less than the amount the Leals financed. Written notice of the Leals' right of cancellation was not provided by Defendants. Notice that the Leals had the option to purchase coverage from a different, independent provider was also not provided. The amount of the GAP charge retained by Defendants was not disclosed.

13. Counsel has subsequently obtained a copy of the GAP policy issued in the course of the Leal transactions. This is also a preprinted form provided by Defendants to the Leals and other consumers, including the putative class members. The policy document does not properly and adequately disclose in boldface type: purported exclusions, the option to obtain coverage from an alternate source, its optional nature, cancellation rights, the fact that GAP is not a substitute for collision or property damage insurance, or a notice of benefits decreasing over time. In small print, not in required boldface type, the policy excludes coverage over 120% of average retail book value. The amount of credit extended for the purchase of this vehicle exceeds 125% of the value of the vehicle purchased. In addition, the Leals were not provided with a written cancellation form.

14. Under the TILA and UCCC, charges for GAP imposed by Defendants must be disclosed as a finance charge for reasons including: (a) Defendants did not disclose that GAP was optional; (b) consumers did not sign affirmative requests for coverage after receiving disclosures notifying them of the limitations of coverage; (c) consumers were not informed of the option to purchase GAP from another company; (d) consumers were informed they were required to purchase GAP as a condition of or incident to the extension of credit; and (e) Defendants retained a portion of the GAP

charge. Although for all the above-stated reasons they were required to do so, Defendants did not disclose GAP or the retained portion thereof as a finance charge.

15. The GAP policies for the Leals and all putative class members fail to comply with the UCCC and are not permitted as additional charges. Required disclosures are not listed in bold print; the loan on the transaction is well in excess of the value of the purchased vehicle; and the policy does not pay or forgive the deficiency balance at the time of total loss. On the face of the Leals GAP policy, as well as all class members' GAP policies, GAP was not a permitted, additional charge under the UCCC.

16. The Leals traded in a 1998 Dodge Durango and 2004 Honda Accord in association with the Yukon purchase.

17. Defendants inflated the amount allocated to the trade-ins over the actual value of the trade-in vehicles, making it appear that the trade-ins had no price increase effect on the transaction. However, the Durango's fair market value was less than the amount owed on the vehicle, i.e., it was in a "negative equity" position. Defendants did not disclose the prior balance owed (or, "net pay-off") on the RISC, even though the pre-printed forms allocate space for such disclosure. Defendants' falsely claimed this was not applicable ("N/A") in its disclosures to the Leals, concealing the true cost of credit for the transaction.

18. Defendants inflated the cash price of the Yukon **over** what a similarly situated cash customer would have paid, and did not disclose the inflated amount of the trade-in vehicles as a finance charge, further concealing the true cost of credit for the Yukon purchase transaction.

### *The Leal Kia Transaction*

19.     Defendants obtained financing for the Kia vehicle purchased by the Leals in the amount of $15,215.03.  Said amount is identified as the amount financed on the Kia RISC.  However, this amount financed contained charges for products that were never included or made part of the Kia vehicle the Leals purchased.

20.     Defendants obtained a loan amount this high on the Kia by submitting a fraudulent invoice to the lending institution that the vehicle had certain equipment and accessories which it did not actually have.  This practice is commonly referred to as "Powerbooking." The products which Defendants claimed on the fraudulent invoice submitted were included on the invoiced Kia vehicle, but which were in fact *not* on this car, included the following:  a 6 cylinder engine, when the Kia actually has a 4 cylinder engine; aluminum alloy wheels; power sunroof; and an Infinity stereo system.  The phantom equipment and accessories allegedly on the Kia are summarized on a form entitled "Vehicle Retail Value Summary."

21.     Defendants falsified and continue to falsify invoices sent for loan approval so that they can obtain higher loan amounts than what they otherwise could have obtained had the vehicle's true value and components been disclosed.  Defendants engage in this practice so that they can, in turn, obtain more money from the Leals and other consumers as a result of their credit transactions.

22.     The charges for nonexistent equipment and accessories are payable directly or indirectly by the consumer and imposed directly or indirectly by Defendants as an incident to or a condition of the extension of credit.  These charges are not

6

submitted to consumers in comparable cash transactions. The charges for these nonexistent products are finance charges.

23.     Defendants did not disclose to the Leals, or any other putative class member, that they were charging them for nonexistent equipment and accessories that increased the amount of credit these consumers are required to pay. Defendants also did not disclose the nonexistent equipment and accessories as a finance charge.

24.     On their face, the falsified invoices and RISCs demonstrate that the Leals and members of the putative class have been required to pay inflated amounts in their credit transactions.

25.     On their face, the RISCs show that the charges for these nonexistent equipment and accessories were not disclosed as finance charges.

26.     Negative equity, GAP charges, GAP charges retained by Defendants, nonexistent equipment and accessories, and inflated cash price amounts were charges related to the extension of credit to the Leals and all putative class members.

### *The Pauquette Transaction*

27.     On or about July 19, 2003, Mark Pauquette purchased a vehicle from Defendants.

28.     Included in Pauquette's transaction was a charge for GAP in the approximate amount of $585.00.

29.     The GAP policies for Mr. Pauquette and all those similarly situated fail to comply with the UCCC and are not permitted as additional charges for reasons including the fact that the required disclosures are not prominently listed in bold print.

7

On the face of Pauquette's GAP policy, as well as all putative class members' GAP policies, GAP was not a permitted additional charge under the UCCC.

## CLASS ALLEGATIONS

A.   <u>Class Fact Allegations</u>

30.   Sonic trains and staffs sales personnel, sales managers, finance and insurance managers and supervisors at its automobile dealerships, including Massey Pontiac.

31.   Sonic knew that the Massey Pontiac employees they trained were responsible for ensuring that no concealment or misrepresentation occurred during automobile sales or lease transactions.

32.   Sonic also knew that the employees they trained were responsible for ensuring adequate, proper disclosures were made to consumers and that amounts were properly allocated as finance charges.

33.   Defendants are and were responsible for ensuring GAP products sold complied with applicable laws, rules, and regulations.  Sonic also knew that the employees they trained were also responsible for selling products that complied with applicable laws, rules, and regulations.

34.   At all times pertinent to this action, Sonic obtains the payment of money for each vehicle leased, sold and financed through Massey Pontiac.

35.   At all times pertinent to this action, Sonic paid the compensation of the sales and finance personnel of Massey Pontiac who dealt with customers.

36.   Defendants engaged in a pattern and practice of failing to disclose GAP charges, GAP charges retained by Defendants, nonexistent equipment and

accessories, inflated cash price amounts, and inflated amounts financed as finance charges.

37. The practice of failing to disclose GAP charges, GAP charges retained by Defendants, nonexistent equipment and accessories, inflated cash price amounts, and inflated amounts financed as finance charges has been and continues to be pervasive at Massey Pontiac for the period covered by the class complaint.

38. Defendants engaged in a pattern and practice of selling GAP polices that were prohibited under the UCCC including not making required disclosures; and selling GAP on loan transactions where the loan to value ratio is 125% or greater and the policy does not pay or forgive the deficiency balance at the time of total loss.

39. The practice of selling GAP policies that are prohibited under the UCCC has been pervasive at Massey Pontiac for the period covered by the class complaint.

40. Defendants Sonic and Massey Pontiac engaged in a pattern and practice of inflating the cash price of vehicles sold to its credit customers and failing to adequately disclose the inflated amount.

41. The practice of inflating cash prices of vehicles for credit customers with trade-in vehicles in a negative equity position has been pervasive at Massey Pontiac for the period covered by the class complaint.

42. Defendants engaged in a pattern and practice of failing to adequately disclose trade-in over-allowances, actual value, negative equity, prior credit balances, and net trade-in payoff of trade-in vehicles to its credit customers, thereby understating the true cost of credit to purchasers.

43. The practice of improperly and inaccurately disclosing trade-in over-allowances, actual value, negative equity, prior credit balances, and net trade-in payoff has been and continues to be pervasive at Massey Pontiac for the period covered by the class complaint.

44. The patterns and practices of illegal conduct described herein are ascertainable on the face of a limited set of documents.

B.  Class Allegations Pertaining to Fed. R. Civ. P. 23

45. This suit is brought as a class action pursuant to Fed. R. Civ. P. 23 on behalf the following classes:

*GAP Class*

All persons who, on or after 25 March 2003, purchased a GAP policy from Defendants.

*Negative Equity Class*

All persons who, on or after 25 March 2003, traded in a motor vehicle to Defendants where the final payoff amount exceeded the appraised value of the vehicle, plus cash paid and any credits (rebate or customer incentive) applied to the transaction.

*Powerbooking Class*

All persons who, on or after 25 March 2005, obtained financing for the purchase of a motor vehicle from Defendants on the basis of Defendants' false representation to lenders concerning nonexistent equipment and accessories on said vehicle.

46. Based upon preliminary investigation, and assuming a conservative estimate of 75 consumers per month being subjected to these practices, a reasonable estimate of the number of Colorado consumers victimized by the Defendants' deceptive and fraudulent conduct from March 2003 to the present is approximately 2,700 to date.

47.     The membership of the putative class is so numerous that the individual joinder of members is impractical, although the exact number and identities of class members are unknown at this time and can only be ascertained through appropriate discovery.

48.     The claims of the Named Plaintiffs are typical of the claims of the members of the putative class, as all members sustained the same type of injury from the Defendants' deceptive and fraudulent practices which affected the members of the putative class in similar ways.  Members of this class have sustained substantially similar damages.

49.     Named Plaintiffs will fairly and adequately protect the interest of the members of the putative class, all of whom are victims of the Defendants' deceptive and fraudulent practices and have no interest antagonistic to those of the class members. Named Plaintiffs have retained attorneys experienced in the prosecution of complex civil, civil rights, consumer fraud and class litigation.

50.     There are numerous common questions of law and fact arising out of the uniform nature of Defendants' conduct as it relates to the proposed class, making this an appropriate case for resolution by means of a class action.  The common issues include, but are not limited to, the following:

a.     Whether Defendants adhered to a uniform policy of inducing putative class members to enter into purchasing motor vehicles without disclosure of all material terms of the transaction, including full credit-related disclosures;

b.     Whether the Defendants' uniform consumer practices, as they relate to members of the putative class, were unfair, deceptive and/or fraudulent;

  c. Whether Sonic is jointly and severally liable for the deceptive and fraudulent practices of Massey Pontiac's employees based upon Sonic's management, oversight and control of Massey Pontiac and its practices;

  d. Whether Defendants' improper practices harmed the putative class;

  e. Whether the putative class members are entitled to actual damages, treble damages, statutory damages, punitive damages, and other damages;

  f. Whether the putative class members are entitled to attorneys' fees, costs and interest; and

  g. Whether Defendants are liable for individual restitution to affected class members and should have injunctive or equitable relief entered against them.

51. A class action is superior to other available methods for the fair and efficient adjudication of this controversy given that:

  a. Common questions of law and fact predominate over individual questions that may arise, such that there would be efficiencies in litigating the common issues class-wide instead of on a repetitive, individual basis;

  b. The size of each putative class member's damage claim is too small to make individual litigation an economically viable alternative, such that few putative class members have any interest in controlling the prosecution of separate actions;

  c. The defenses the Defendants are expected to raise against the named plaintiffs are typical of those it could be expected to raise against any similarly situated class member;

  d. A class action is required for optimal deterrence, optimal compensation, and to limit the court-awarded reasonable legal expenses incurred by class members;

12

e.  Should individual class members be required to bring separate actions, Courts throughout Colorado would be confronted by a multiplicity of numerous duplicative lawsuits, thus burdening the Court system and creating a risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results would magnify the delay and expense to all parties and the Court system, this class action will present fewer management difficulties while providing unitary adjudication, economies of scale, and comprehensive supervision by a single Court; and

f.  Defendants have acted on grounds generally applicable to the putative class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole necessary to avoid having Defendants continue to treat future consumers in a similar fashion.

52.  Each putative class member will be identified through discovery from Defendants and will be notified and given an opportunity to opt-out of the class in the event he or she has no interest in being represented by this action or prefers to be excluded from the class. The judgment will not be binding on those members who opt-out of the putative class. Thus, any class members who have an interest in prosecuting separate claims and controlling their own litigation against Defendants will not be prejudiced by this action.

### First Claim for Relief
(Violation of TILA Against Both Defendants)

53.  Plaintiffs incorporate paragraphs 1 through 52 as if fully incorporated herein.

54. The Leals' transaction and those of each member of the putative class were consumer credit transactions within the meaning of TILA, including Federal Reserve Board Regulation Z, 12 C.F.R. part 226 ("Regulation Z").

55. In connection with the sale of automobiles, it is the common and uniform pattern and practice of Defendants to regularly extend consumer credit to motor vehicle purchasers by Retail Installment Sales Contracts or "RISCs".

56. Defendants are creditors within the meaning of TILA.

57. Defendants originated consumer credit transactions with the Leals, and those similarly situated, for which a finance charge was imposed.

58. GAP charges, GAP charges retained by Defendants, phantom add-ons, and inflated cash price amounts were charges related to the extension of credit to the Leals and all class members and are finance charges within the meaning of TILA.

59. Disclosures issued by Defendants in conjunction with these items violated the requirements of TILA, including Regulation Z. The finance charges disclosures did not include these amounts and, thus, were improperly disclosed. The listing of amounts financed included these finance charges and, thus, were improperly disclosed.

60. Defendants' violations of TILA, including Regulation Z, are apparent on the face of each putative class member's RISC.

61. Defendants' violations of TILA, including Regulation Z, were willful.

62. Defendants' violations of TILA, including Regulation Z, proximately caused damages to Plaintiffs and the class.

WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

## Second Claim for Relief
(Violation of UCCC against Both Defendants)

63.     Plaintiffs incorporate paragraphs 1 through 62 as if fully alleged herein.

64.     Defendants actions described above are violations of the UCCC in that violations of TILA are also violations of the UCCC.

65.     Defendant sold GAP policies to consumers when said charges were not permitted under Rule 8 of the UCCC Rules ("Rule 8").  Defendants did not comply with disclosure requirements, including failing to list in bold print exclusions, voluntariness, cancellation rights, decreasing benefits over time, and option to purchase elsewhere. Defendant sold GAP policies to consumers when said sale was prohibited due to the policies' exclusion of any amount greater than 120% of blue book value and the fact that the loan to value of vehicle ratio is 125% or higher, per the UCCC, including Rule 8.

66.     Defendants violations of the UCCC are apparent on the face of each consumers' RISC and the written GAP policy documents.

67.     Defendants violations of the UCCC were willful.

68.     Defendants violations of the UCCC proximately caused damages to Plaintiffs and the putative class.

WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

## Third Claim for Relief
(Violation of the CCPA Against Both Defendants)

69.     Plaintiffs incorporate paragraphs 1 through 68 as if fully alleged herein.

70.     As summarized above, in the course of their businesses, Defendants engaged in unfair and deceptive practices within the meaning of the CCPA.

15

71. Defendants' unfair and deceptive practices significantly affect the public as actual and potential consumers of Defendants' goods.

72. Plaintiffs have suffered in fact because of Defendants' unfair and deceptive practices.

73. Defendants engaged in bad faith conduct within the meaning of the CCPA.

WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

### Fourth Claim for Relief
(Violation of Statutory Provisions Regulating the Conduct of
Automobile Dealerships Against Both Defendants)

74. Plaintiffs incorporate paragraphs 1 through 73 as if fully alleged herein.

75. Defendants' conduct, as detailed and alleged above, constituted fraudulent conduct, comprised of but not limited to the making of fraudulent misrepresentations, within the meaning of C.R.S. § 12-6-122.

76. Defendants' conduct, as detailed and alleged above, was a violation of C.R.S. § 12-6-122.

77. Plaintiffs have suffered damages proximately caused by Defendants' violation of C.R.S. § 12-6-122.

WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

### Fifth Claim for Relief
(Fraudulent Concealment Against Both Defendants)

78. Plaintiffs incorporate paragraphs 1 through 77 as if fully alleged herein.

79. Defendants concealed present facts from and/or failed to disclose to Plaintiffs present facts which they had a duty to disclose.

80. The present facts which Defendants concealed from and/or which they failed to disclose to Plaintiffs were material.

16

81. Defendants concealed these present facts, and/or failed to disclose these present facts, with the intent that Plaintiffs take a course of action they might not take if Plaintiffs knew the true present facts.

82. Plaintiffs undertook a course of action relying on the assumption that the concealed and/or undisclosed present facts were different from what they actually were.

83. Plaintiffs' reliance was justified.

84. Plaintiffs' justifiable reliance proximately caused them damages.

WHEREFORE, Plaintiffs pray for relief as more fully set forth below.

### Sixth Claim for Relief
(Negligent Supervision Against Both Defendants)

85. Plaintiffs incorporate the allegations set forth in paragraphs 1 through 84 of this complaint as if fully alleged herein.

86. Defendants knew, or through the exercise of reasonable diligence should have known, that certain of their supervisory and non-supervisory employees (the "Culpable Employees") were, in the course of their duties for Defendants, causing injury to Plaintiffs, and otherwise violating Plaintiffs' rights and privileges protected by TILA, the UCCC and the CCPA.

87. Defendants owed Plaintiffs a duty to use reasonable care in training and supervising its Culpable Employees who were injuring Plaintiffs and otherwise violating Plaintiffs' rights and privileges.

88. Defendants breached their duty to Plaintiffs when it failed to properly train and supervise their Culpable Employees and in so doing failed to prevent the above-referenced unlawful conduct.

89.   Plaintiffs' injuries were a reasonably foreseeable result of Defendants' failure to properly train and supervise their Culpable Employees.

90.   Plaintiffs' injuries were proximately caused by Defendants' failure to properly train and supervise their Culpable Employees.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray that this Court enter judgment in their favor and jointly and severally against each Defendant, and that it order the following relief:

A.   Certify this case as a class action pursuant to Fed. R. Civ. P. 23;

B.   Designate Plaintiffs Mark Leal, Tanya Leal and Mark Pauquette Class Representatives;

C.   Designate undersigned counsel as Class Counsel;

D.   Actual damages against each Defendant for the amount of class members' GAP charges, amount of inflated loan amount due to phantom add-on products, taxes and fees imposed due to inflated cash prices, and other actual damages, as allowed by law;

E.   Statutory damages against each Defendant;

F.   Maximum civil penalties against each Defendant as allowed by law including but not limited to twice the amount of the finance charges in connection with each transaction in the amount of at least $100 and not exceeding $1000.

H.   Order Defendants to disgorge any amounts earned by them for improper and deceptive practices;

I.   Enjoin all Defendants from engaging in any future furtherance of any of the unlawful practices complained of herein;

J. Enter a declaratory judgment that Defendants' practices are prohibited by federal and state law, as described herein;

K. Attorney's fees and costs;

L. Pre-judgment and post-judgment interest; and

M. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury as to all issues so triable.

Respectfully submitted this 12th day of April, 2006.

McNAMARA & MARTÍNEZ LLP

s/ William J. Martínez
_____
1640 East 18th Avenue
Denver, CO  80218
Tel:  303/333-8700
Fax: 303/331-6967
E-mail: wjm@mcmarlaw.com

WILLS LAW FIRM, PC

/ Stephen S. Wills
_____
Stephen S. Wills
2338 Broadway
Boulder, CO 80304
Tel:  303/449-4441
Fax: 303/447-1635
E-mail: steve@willslawfirm.com

ANGLE & ANGLE LLC

s/ David R. Angle
_____
1881 9th Street, Suite 315
Boulder, CO 80302
Tel: 303/443-2200
Fax: 303/443-2229
E-mail: dave@daveangle.com

LYONS & FARRAR P.A.

Douglas S. Lyons
325 North Calhoun Street
Tallahassee, FL 32301
Tel: 850/222 8811
Fax: 850/222 5583
E-mail: dslyons@earthlink.net

ATTORNEYS FOR PLAINTIFFS